

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MKM:NEM/MCM/ABK
F. #2015R00888

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 29, 2016

<u>By Hand Delivery and ECF</u>

The Honorable Carol Bagley Amon
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re: <u>United States v. Guifu Gao</u>
       <u>Criminal Docket No. 15-628 (CBA)</u>

Dear Judge Amon:

  The government respectfully submits this letter in advance of sentencing in the above-referenced case, which is scheduled for January 6, 2017. For the reasons discussed below, the government respectfully requests that the Court impose a sentence of at least 78 months, which is the top end of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") imprisonment range of 63 to 78 months, as calculated by the government.

I. <u>Background</u>[1]

  On September 8, 2016, the defendant, Guifu Gao, also known as "Chicken Feather" ("Gao" or the "defendant") pled guilty to a single-count Superseding Information, charging that, between October 2014 and July 2015, the defendant, together with others, conspired to participate in the use of extortionate means to punish an individual identified as "John Doe #1" (hereinafter, the "Victim") for the non-repayment of one or more extensions

---

[1] By letter dated December 28, 2016, the government filed objections to the Presentence Investigation Report ("PSR"), dated December 2, 2016, together with a response to the defendant's objections to the PSR, dated December 12, 2016. To avoid unnecessary repetition, the government's December 28, 2016 letter is incorporated herein by reference.

of credit, in violation of Title 18, United States Code, Section 894(a)(2). The charges against the defendant arise from his role in ordering the assault of the Victim.

In approximately August 2014, the defendant gave the Victim approximately $30,000 to transfer by wire to China. (PSR ¶ 10.) The Victim knew that Gao owed another individual $15,000 and provided $15,000 to him. The remaining $15,000 was returned to Gao. Incensed that the Victim had used his money to repay one of Gao's debts without his authorization, the defendant approached co-defendant Qian Zheng, also known as "Cash" (hereinafter, "Zheng"), seeking to hire one of Zheng's criminal associates to assault the Victim, whom the defendant claimed owed him money. (PSR ¶ 10.) In turn, in October 2014, Zheng introduced the defendant to a cooperating witness ("CW1") so that CW1 could carry out the assault. (PSR ¶ 9.) CW1 stated that he would get the "job" done by hiring a few "black guys" to carry out the beating. (Id.) Ultimately, the defendant's plan was not carried out and CW1 warned the Victim of the defendant's intentions and the Victim feigned injury in an attempt to avoid further retaliation from the defendant.

II.     Guidelines Calculation

The defendant's Guidelines calculation is as follows:

| | |
|---|---:|
| Base Offense Level (§§ 2E2.1(a)) | 20 |
| Plus:   Dangerous Weapon Used (§ 2E2.1(b)(1)(B)) | +4[2] |
| Plus:   Permanent Bodily Injury (§ 2E2.1(b)(2)(C)) | +6[3] |
| Subtotal: | 30 |

Pursuant to U.S.S.G. § 2E2.1(b), the combined increase for specific offense characteristics may not exceed nine levels; thus, the effective adjusted offense level is 29. Additionally, because the defendant timely accepted responsibility, his offense level is reduced by three levels, resulting in a total offense level of 26. The Probation Department has correctly determined the defendant has no criminal history, and thus, he falls into Criminal History Category I. Accordingly, the defendant's Guidelines range of imprisonment is 63 to 78 months.

---

[2]     As noted below, in recorded conversations the defendant variously instructed CW1 to have bats, knives and guns used to injure the Victim.

[3]     As noted below, in recorded conversations the defendant ordered CW1 to break the Victim's legs in half so that he would be crippled and could not walk again.

III.     Sentencing Factors

Title 18, United States Code, Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation (§ 3553(a)(2)(A)), as well as the need for the sentence to afford adequate deterrence to criminal conduct (§ 3553(a)(2)(B)) and to protect the public from further crimes or violations of the defendant (§ 3553(a)(2)(C)).  All of these factors require a significant term of incarceration.

The seriousness of the defendant's crime cannot be understated.  The defendant solicited an assault that would have resulted in extremely serious injuries to the Victim.  When the Victim did not appear to have been beaten severely enough, the defendant escalated his requests and demanded that CW1 make the Victim "crippled" and "handicapped."  The defendant directed CW1 to use whatever violent means necessary to achieve the defendant's depraved demands, including stabbing the Victim in his legs, breaking the Victim's legs "in half," and beating him "until he is half dead."  The defendant also solicited the stabbing of another individual.  As such, his claim that "aside from this case, Mr. Gao, has always maintained a law abiding life," (Def. Memo. at 4), is patently false. Recorded conversations made by CW1 capture the truly violent nature of the defendant's plan, recording the defendant soliciting the assault, explaining in detail how he wanted the assault carried out, and arranging payment for the assault.[4]  In one such recording from October 30, 2014, the defendant and CW1 first discussed that the "boss" (referring to Zheng) had put them in contact and that the defendant wanted the Victim—whom the defendant described as "a fucking kid" and "[a] nobody"—to be "beat up."  (PSR ¶ 11.)  When CW1 asked how the Victim should be beaten, the defendant responded, "beat him . . . beat him . . . beat him until he is half dead.  Fuck him." (Id.)

As noted above, CW1 did not have the Victim beaten and instead alerted the Victim of the defendant and Zheng's plan, convincing the Victim to feign injury for the Victim's own safety.  (PSR ¶ 9.)  CW1 also falsely told the defendant that the Victim had been beaten.  However, when the defendant saw that the Victim had returned to work, he was unsatisfied with the result of the supposed beating.  (Id.)

In a recording made by CW1 on December 25, 2014, the defendant complained to CW1 that the Victim had not been satisfactorily beaten and was able to go back to work because he was uninjured.  ("We fucking said that we wanted it done severely.  The black guys probably only fucking waved around [the bats] sloppily.  It hasn't even been a few fucking days.  He went back to the store already.  Like nothing ever happened.")  In fact, unbeknownst at the time to CW1, the defendant was so unsatisfied that he and another individual accosted

---

[4] All of the consensually recorded conversations relating to the defendant's solicitation of the assaults are attached hereto as Exhibit A.

3

the Victim themselves as he walked to his car with his girlfriend and her two small children, who could only look on in horror as the Victim was waylaid. ("I even charged into his store to push him already, you know?"). The defendant then instructed CW1 that he needed to "stab" the Victim's legs "twice" and "break his legs[.]" (PSR ¶ 13.)

In a recorded conversation from January 1, 2015, Gao continued to express his dissatisfaction with the injuries that the Victim, who he referred to as a "son of a bitch," had sustained and complained that the "the beating is not severe enough. Maybe the beating gave him a scratch, or just flesh wounds, not serious." The defendant also explained that he found what he hoped was the Victim's home address but that he needed to confirm it. CW1 explained that the job would cost $10,000 and the defendant told CW1 to "break his legs in half for me. . . . break both his legs in half for me."

On January 4, 2015, the defendant again confirmed with CW1 that he wanted him to "break both of his legs." Later than night, when CW1 informed the defendant that the "black guys" were at the store to assault the Victim, the defendant explained that he now also wanted them to "break his right hand . . . in half too." The defendant also explained that they needed to beat him "not to injure him [but to] break it in half . . . . You need to break it in half. Of course break it in half .. . . Break his arm and legs in half." Later that night, in another recorded conversation, CW1 falsely told the defendant that the "job [wa]s done." The defendant responded that he would go the bank tomorrow and then pay CW1. Thereafter, in a recorded conversation on January 6, 2015, the defendant paid CW1 $5,000. (PSR ¶ 16.) The defendant explained that once he verified that the assault had taken place, he would pay CW1 the balance owed for the job. (Id.) The defendant explained that the Victim "needs to be disabled . . . crippled, make him handicapped." (Id.)

In another recorded conversation, CW1 reported back to Zheng and explained that the job was done, but that the defendant had not paid him yet. (PSR ¶ 17.) The next day, the defendant explained that he needed the Victim's legs broken as opposed to stabbed because "fuck, to stab him twice on his legs, fuck, he would recover from two stabbing wounds on his legs. They wouldn't be broken . . . . The wounds on the legs will recover . . . . If they are broken . . . he needs to be disabled . . . . Stab him twice, fuck, he would recover in a few days. He could walk again. We break them, okay?"

In a recorded conversation from March 31, 2015 Zheng explained that CW1 had not completed the job satisfactorily and that the Victim had not been injured seriously enough. CW1 explained that the defendant "told me to get the back guys to go there [to the Victim] and fire two shots[.]" When CW1 expressed concern to Zheng that the defendant would not compensate him for the assault, CW1 reported that the defendant had told him that money would not be a "problem" because the defendant had "followed" Zheng for "over ten years[.]" In response, Zheng assured CW1 that "[m]oney is not a problem." This conversation not only demonstrates that Zheng was familiar with the details of the defendant's plan to have the Victim assaulted, but also shows that the Zheng facilitated and approved of the defendant's plan and that the defendant was overseen by Zheng, whom the defendant had followed for a decade. (See PSR ¶ 18.)

4

The defendant sought to have the Victim beaten further after he was unsatisfied with his prior purported injuries. In an April 2015 recorded conversation, CW1 asked whether the defendant had told the "boss" (Zheng) of the defendant's continued desire to have the Victim beaten. (PSR ¶ 19.) In response, the defendant said that he told the boss and the "boss said okay. He wants you to go ahead." (Id.) Thereafter, in a recorded conversation from April 28, 2015, Zheng told CW1 "That motherfucker [the Victim] is not scared after getting beaten. Motherfucker, keep beating him . . . maybe he wasn't beaten serious enough! . . . . Beat him in front of his house at night. Beat him hard." (PSR ¶ 20.)

In another recorded conversation from July 27, 2015, the defendant told CW1 that "I cannot let a son of a bitch like this [the Victim], an ungrateful shithead, cheat me." The defendant went on to explain that while "that shitty kid, he was beaten [by the "black guys"] twice" . . . "I was very unhappy about it." He again complained that the prior beatings had not been to his satisfaction: "I requested for his legs to be broken in half. Fuck, two days after the beating, he went back to do nails. Nothing happened to him. What kind of job was done by them?" He also instructed CW1 to "break his legs for me. Break them in half . . . break his legs – $5,000 from me."

During the course of the charged extortion conspiracy Gao also hired CW1 to seriously assault another individual. For instance, in a recorded conversation from May 6, 2015, Gao asks CW1 "Do you want to do the business? If you want to do it, then we meet and talk. If you don't want to do it, then I won't call you again." CW1 agreed to meet the defendant later that night. The defendant told CW1 "I have another deal with me. I came to you for that. Boss told me to whatever with you about it." The defendant said that he would send CW1 a photograph and then the following conversation took place:

> GAO: Last time, didn't we talk about that one on 57th Street?
>
> CW1: Huh? 57th Street? The restaurant guy you mentioned?[5]
>
> GAO: Yeah, yeah, yeah. Here it is.
>
> CW1: This is the photo? Send it to me. Send it to me on WeChat.
>
> GAO: I am sending.
>
> . . .
>
> CW1: How badly do you want him beaten?
>
> GAO: Um . . . break his legs for me. See what you can do.

---

[5] The Victim does not work at a restaurant, and as explained in other recorded conversations, the defendant was aware that the Victim worked at a nail salon.

5

. . .

CW1: What is the address?

GAO: Address . . . okay, wait . . . 57th Street, 515

. . .

GAO: Okay. 57th Street, 515. This is the photo. You tell me . . . what . . .what's the deal? For his legs, how about this, fuck, beat him . . . if you guys don't dare to beat him, just take a knife and take his legs.

CW1: It's not that they don't dare to beat him. They do dare to beat him. Price is the issue.

GAO: Okay. Then you just take a knife and stab his legs two or three times for me.

CW1: Stab him two or three times? That's fine.

GAO: Stab both two or three times on both legs for me.

CW1: Okay. Is there anyone else in his shop?

GAO: Is there anyone else in his shop?

CW1: Yeah.

GAO: No, this is his house. He lives there.[6]

. . .

CW1: How about this, I will discuss the price with the black guys before I let you know [about the price]?

GAO: About how much?

CW1: About . . . several thousand?

GAO: Okay, fine.

This establishes that the defendant was again willing to pay thousands of dollars to ensure the use of extreme force was used against those with whom he had disputes. After Gao hired CW1 for this vicious assault, Gao explained in another recorded conversation from July 21, 2015 that "the person ran away." In another recorded conversation from July 27,

---

[6] This is not the Victim's home address.

6

2015, when assuring CW1 that he would pay him when the job with the Victim was done, the defendant explained "we keep our word. The price is what it is. You do the job for me. Okay? I pay you the money. That's fine. I always do like this on the street." This references the defendant's connection to prior criminal activity.

Notwithstanding his clearly violent intentions, in his sentencing memorandum, the defendant minimizes the seriousness of his conduct by arguing that the Victim was not hurt and was "never in any danger at any time." (Def. Mem. at 2.)[7] Not only is this statement factually incorrect, but the defendant misses the point and fails to recognize the egregiousness of his conduct. In fact, the defendant and another individual assaulted the Victim in front of his girlfriend and her young children after CW1 failed to carry out a sufficiently severe beating. Indeed, in a recorded conversation between CW1 and the defendant on December 25, 2014, the defendant complained that he "even charged into his [the Victim's] store to push him . . ." Thus, the defendant demonstrated—through his words and his actions—that he was serious about crippling the Victim. The only reason that the assaults were not carried out and the Victim can still walk is because— unbeknownst to the defendant—the Victim was alerted to his plans and feigned injury for his own safety from future attacks. Indeed, the defendant is so dismissive of the seriousness of his conduct that he refers to the man he sought to cripple as a "'victim.'" (Def. Mem. at 2, 5). The Victim in this case was aware that the defendant had hired an individual to cause him serious bodily injury. Had that individual not been a cooperating witness, he would have been able to carry out the defendant's malicious intent. This surely caused unspeakable terror on the part of the Victim. The defendant also hired CW1 to stab another individual multiple times. This vicious attack was not carried out only because this individual became aware of Gao's intent and went into hiding.

---

[7] The defendant also claims that he "ended up" pleading guilty to the instant offense because of "problems" with the government's proof. (Def. Sentencing Mem. at 2.) Although is it unclear from this statement whether the defendant is failing to accept responsibility or making some other point, one thing is clear: the government's proof against the defendant was strong and consisted, <u>inter alia</u>, of consensually recorded conversations (including recordings of the defendant soliciting multiple assaults in chilling detail), the testimony of CW1, eyewitness testimony and text messages, and the defendant's own <u>Mirandized</u> confession to the vicious crimes.

While the plea process in this matter was protracted, this had nothing to do with any issues in the government's proof. The defendant was prepared to plead guilty to an assault in aid of racketeering and allocuted before the Court. At the scheduled plea hearing, defense counsel raised a legal sufficiency argument. While the government believes that defense counsel is incorrect with regard to her legal sufficiency argument, given the procedural posture caused by her assertions, the government requested that the court not accept the defendant's guilty plea. The Court agreed and, thereafter, the defendant pleaded guilty to an extortionate collection of credit conspiracy. That he pleaded guilty to this offense, as opposed to assault in aid of racketeering charges, had nothing to do with any purported issues with the government's proof of the defendant's guilt.

The defendant further attempts to minimize his conduct by claiming that he did not want to use any weapons in the attack. While it is true that at first the defendant explained that it wasn't necessary in the first beating to use weapons, he said "just give him a severe beating <u>first</u>." His use of the word "first" indicates that even at the outset he intended to assault the Victim multiple times. The defendant is also mistaken in suggesting that CW1 first suggested the use of dangerous weapons in the assault of the Victim. On December 25, 2014, after the defendant complained that the Victim was not satisfactorily injured, and that perhaps the "black guys" hired to carry out assault only waved around the bats that should have been used to beat the Victim, the defendant tells CW1 "see if you can stab his legs twice for me." This conversation, which contrary to the defendant's baseless assertion was provided to defense counsel on February 17, 2016, makes clear that the defendant intended to have weapons used and is the one who suggested the use of knives or some other similar object to stab the Victim. When the defendant told CW1 not to use knives on January 4, 2015, it was not because he did not want dangerous weapons used to inflict unspeakable injury on the Victim. Instead, it was because he had changed his mind and decided that he wanted the Victim's legs broken in half in lieu of the Victim being stabbed.

As the defendant himself explained in another recorded conversation the very next day, he wanted the Victim's legs broken as opposed to stabbed because "fuck, to stab him twice on his legs, fuck, he would recover from two stabbing wounds on his legs. They wouldn't be broken. . . . The wounds on the legs will recover . . . If they are broken . . . he needs to be disabled. . . . Stab him twice, fuck, he would recover in a few days. <u>He could walk again.</u> We break them, okay?" The defendant's decision to cripple the Victim instead of stab him in no way militates his actions. If anything, the defendant's second request, which would not involve the use of a knife, but would leave the Victim permanently injured, is far more serious and depraved than his initial request that the Victim be repeatedly stabbed.

The defendant also attempts to explain his extreme behavior by claiming that his use of ketamine, "at the time of the events in question," made him "more violent[.]" (Def. Sentencing Mem. at 3.) There is no evidence from which the defendant or the Court may properly draw such a conclusion, and this "explanation" should be viewed with great skepticism by the Court. (<u>See</u> <u>id.</u>) Indeed, the defendant told Probation that in 2015, during the period in which he asked that the Victim be crippled, he used ketamine "very seldom[ly]." PSR ¶ 61. It is well established that ketamine—an animal tranquilizer—is a sedative, not a stimulant. For this reason, ketamine can be used to sedate violent behavior. <u>See</u>, e.g., Kenneth A. Scheppke, M.D., <u>et</u> <u>al.</u>, <u>Prehospital Use of IM Ketamine for Sedation of Violent and Agitated Patients</u> (Nov. 2014), Western Journal of Emergency Medicine, Nov. 2014, at 736-41 (concluding that ketamine is a "potentially ideal drug" for "prehospital sedation" (<u>i.e.</u>, in transit to the emergency room) because it has an "excellent safety profile, potent anesthetic effects and rapid onset of action with an absence of respiratory depression and a short duration of action.").[8]

---

[8] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4251212 (last visited on December 29, 2016).

Moreover, even assuming, arguendo, that ketamine causes violent behavior in some users, the record belies this claim as to the defendant. Consensually recorded communications between the defendant and CW1 occurred from approximately October 2014 through July 2015, a period of nine months. The defendant cannot plausibly claim that he was high on ketamine each time he spoke with CW1 and directed CW1 to beat the Victim, despite the short duration of its sedative effects[9]. A review of the recorded conversations further draws into question the defendant's purported explanation. Numerous recorded conversations in which he solicited the two extreme assaults took place between noon and 8:30pm, including calls in which the defendant attempted to negotiate the price for the assault down from $10,000 to $9,000, and then ultimately agreed to pay $10,000 for the assault. The defendant also retrieved money to pay CW1 from a bank, which would not have been open between 11pm and 1am – the times of his alleged ketamine binges. (Def. Memo. at 3).

Further, the defendant now claims that the money he had asked the Victim to wire to China was for his "mother's medical bills." (Def. Sentencing Mem. at 5.) There is no evidence in the record to support this assertion. The defendant never mentioned this in the dozens of conversations he had with CW1, nor in his post-arrest statement to law enforcement agents. The defendant did, however, mention to CW1 that there had been prior financial dealings that had caused the Victim to divert the money. For this reason alone, the Court should place little, if any, weight on the defendant's claim. More fundamentally, the vicious manner in which the defendant conspired to collect the debt cannot be explained or excused by claiming that the money was intended for his mother's benefit. [10]

---

[9] CW1 has informed the government that Gao did not appear high on ketamine during their conversations and a review of the recordings of the defendant's solicitation, reveals that he does not slur his words, is fully able to carry on conversations, including answering responsively to CW1, and does not otherwise appear affected by narcotics.

[10] The defendant also states that he moved to the United States because he was persecuted in China. The government notes that, notwithstanding his alleged persecution, at the time of his arrest two of his children, his parents, and his siblings lived in China, and the defendant traveled to China for 22 days in 2012, 22 days in 2013, and 25 days in 2014. (PSR ¶¶ 47, 49.)

Furthermore, it appears as if the defendant's tax returns are inconsistent with the income he reported to Probation. He informed Probation that he earned "$3,000 to $4,000 a month" when he worked at New Ann's Nail Design. The defendant worked here from 2009 until his arrest in 2015. PSR ¶ 64. His adjusted gross income for the years 2012 through 2014, however, was always $7,200. (PSR ¶ 70.) These inconsistencies suggest possible false statements by the defendant to the government.

9

Under these circumstances, the defendant's request for 24 months' imprisonment is far too lenient and should be rejected by the Court. The severe nature of the defendant's crime, the need to adequately punish the defendant, the need to provide adequate deterrence to the defendant and others who would contemplate similar crimes, and the interests in protecting the public from future crimes of the defendant all warrant the imposition by the Court of a significant period of incarceration.

IV.   Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of at least 78 months' imprisonment.

    Respectfully submitted,

    ROBERT L. CAPERS
    United States Attorney

By:   /s/
    Nadia E. Moore
    Maria Cruz Melendez
    Ameet B. Kabrawala
    Assistant U.S. Attorneys
    (718) 254-7000

cc:   Stacey Van Malden, Esq.
     Counsel to Defendant

     Ms. Cheryl M. Fiorillo
     U.S. Probation Officer